WILLIAM WELLING *vs.* EDWARD H. OWINGS AND OTHERS.
*June* 1851.

The true construction of the 2nd section of the act of 1810, ch. 34, relating to nuncupative wills, requires, that the testamentary words, or the substance thereof, should be reduced to writing, within six days after they were uttered and shown to and approved of, as correct, by *each* of the attesting witnesses.

The word "testimony," used in this section, applies to the nuncupation itself, and not to the prerequisites required by the 1st section, which may be established at any time before the paper is admitted to probate.

The testamentary words must be reduced to writing, and seen by, and found to be correct, by *each* of the attesting witnesses, within the period limited by the 2nd section of this act.

Where testamentary words were reduced to writing by one of the witnesses, and shown by him to another, within the time prescribed by the act, but were not reduced to writing by the third witness, nor seen by him until more than twelve months after the testator's death. HELD: That such words could not be admitted to probate.

APPEAL from the orphans court of *Baltimore* county.

This is an appeal from an order of the orphans court, admitting to probate testamentary words purporting to be the nuncupative will of *Richard H. Owings*, deceased, reduced to writing by *Basil Owings*, the father of the deceased, and one of the attesting witnesses, as follows:

" On the 29th day of August, 1849, *Richard H. Owings*, of the city of *Baltimore*, called on *Mr. Taylor*, *Mrs. Mills*, and myself, to witness his will, which he declared to be as follows: ' I leave all that I am worth to my mother, to be divided between my brothers and sisters.' As witness my hand, this 31st day of August, 1849.    BASIL OWINGS."

This will was offered for probate, on the 7th of November, 1850, and a *caveat* was filed thereto by the appellant, one of the creditors of *Basil Owings*, the father of the deceased, said *Basil* having applied for the benefit of the insolvent laws prior to the death of his son. This *caveat* was answered by the appellees, the brothers and sisters of the deceased, and the depositions of *Basil Owings*, *Elizabeth Mills* and *John H. Taylor*, the three attesting witnesses above referred to, were taken, establishing the following facts: That the witnesses were called upon by the deceased, at the time he spoke the words, to witness his will. That the words were spoken by the deceased in his last illness, the day before his death, at the house of *Hezekiah Magruder*, of the city of *Baltimore*, where the deceased resided for more than ten days next previous to his decease, and were reduced to writing by said *Basil Owings*, about two hours after his son's death. That said *Basil* showed the writing to *Mrs. Mills* immediately thereafter, who read and approved of the same. That *Mr. Taylor*, the other witness, never saw the paper until about December 1850, and never reduced the same to writing at all. This witness, how-

ever, swore that the words in the paper were the words spoken by the deceased, as stated by the other witnesses. The estate of the deceased was admitted to amount to, at least, $400.

On this testimony the orphans court passed an order, admitting the same to probate, from which the caveator, *Welling*, appealed.

The first section of the act of 1810, ch. 34, is as follows:

" *Be it enacted*, that no nuncupative will, hereafter to be made, shall be good, where the estate thereby bequeathed shall exceed the value of $300, that is not proved by the oaths of three witnesses at least, who were present at the making thereof; nor unless it be proved, that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, to bear witness that such was his will, or to that effect; nor unless such nuncupative will were made in the time of the last sickness of the deceased, and in the house of his or her habitation or dwelling, or where he or she had been resident for the space of ten days, or more, next before the making of such will, except where such person was surprised or taken sick, being from his own home, and died before he or she returned to the place of his or her dwelling." The second section is quoted at length in the opinion of this court.

The cause was argued before Dorsey, C. J., Spence, Martin and Frick, J.

Wm. H. G. Dorsey for the appellants, insisted upon a reversal of the order.

1st. Because the paper writing was not exhibited to one of the witnesses until after six months had elapsed from the death of *Richard H. Owings*.

2nd. Because the testimony of the witnesses was not committed to writing within six months after the speaking of the pretended testamentary words.

Chas. H. Pitts for the appellee, contended there was no error in the decree of the orphans court.

Because the act of Assembly, in relation to nuncupative wills, was substantially complied with, as the testamentary words were reduced to writing within six days after the death of the testator, and were proved by three witnesses.

MARTIN, J., delivered the opinion of this court.

As in this case it has been conceded that all the facts necessary to impart validity to a nuncupative will, as required by the *first* section of the act of Assembly of 1810, ch. 34, existed, the correctness of the order of the orphans court in admitting to probate the paper now in contestation depends exclusively upon the interpretation of the second section of that statute.

That section is in the following words:—

"That six months after the speaking of the pretended testamentary words, no testimony shall be received to prove any will nuncupative, except the said testimony, or the substance thereof were committed to writing within six days after the making of the said will," and in a case like the one before us, the true construction of this section requires, we think, that the testamentary words, or the substance thereof, should be reduced to writing within six days after they were uttered, and shown to, and approved of as correct by *each* of the attesting witnesses. It is well known that testaments of this character are, from their nature, not only open to fraud and fabrication, but peculiarly exposed to mistakes in relation to the testator's intention on account of the imperfection and frailty of human memory. And it is manifest, that the legislature in legalizing these nuncupative wills, intended to guard the testator against imposition and to protect him from mistakes, by requiring that these testaments should in point of accuracy, approximate as near as possible to written wills, and they believed that this purpose would be only accomplished by demanding that the testamentary words, as uttered, should be written down and seen and recognised as correct by each of the three attesting witnesses, while the language of the testator was fresh in their recollection.

The word "testimony" as used in this section, applies, we think, to the nuncupation itself, and not to the prerequisites required by the *first* section of the statute, as that the will was made in the last sickness of the testator, and in the house of his habitation. These certainly are material facts with respect to the predicament of a person making a nuncupative will, and must be clearly proved. But they are facts which may be established at any time before the paper is admitted to probate, and need not be proved by the attesting witnesses. No useful purpose could be gained by requiring testimony of this kind to be reduced to writing within six days after the will was made. The provision with regard to the testamentary words, stands however upon a very different ground. It is obvious that accuracy and precision in reference to the words used by the testator, is of the greatest importance, as his intention with respect to the disposition of his estate can only be known from the language he may have employed to communicate his meaning. And that accuracy might be secured, so far as practicable, in reference to the words used by the testator, we understand the legislature to have required that these testamentary words, or the substance of them, should be reduced to writing, and should be seen by, and found to be correct, by each of the three attesting witnesses, within the period limited by the second section of the statute.

It follows from the construction we have thus placed on the second section of the act of Assembly of 1810, ch. 34, that the decree of the orphans court admitting this paper to probate is erroneous and must be reversed. For it appears from the record, that although the pretended testamentary words were reduced to writing by one of the witnesses, and shown by him to another, within the time prescribed by the act, yet they were never reduced to writing by *Taylor*, the third witness, and were not seen by him until more than twelve months after the testator's death.

The order of the orphans court is reversed with costs.

ORDER REVERSED WITH COSTS.